**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Deborah Caine, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> Sturdy Memorial Hospital, Inc., <br><br> Defendant. | Case No.: 1:25-cv-10261-ADB <br><br> **Second Amended Class Action Complaint** <br><br> **Jury Trial Demanded** |

### Introduction

1.      Sturdy Memorial Hospital, Inc. ("Sturdy") operates websites for its various medical facilities through which Sturdy patients book appointments, describe symptoms, and communicate highly sensitive personal medical information intended only for their doctors and health services professionals.

2.      Unbeknownst to the patients who use its medical websites, for an indeterminate period of time through at least July 2024 Sturdy enabled third parties, including Google,  to secretly eavesdrop on patients' and healthcare consumers' communications with Sturdy, by adding hidden code to the its website. Google then associated the intercepted communications with the actual identities of the website users know to Google. Next Google used the contents of the intercepted communications for commercial purposes, such as serving personalized advertisements to healthcare consumers, including advertisements for Sturdy patients, based on the contents of the secretly intercepted communications. The intercepted communications included patients' private protected health information ("PHI") and individually

identifiable health information ("IIHI").

3. Both Massachusetts and federal law protect the confidentiality of a patient's private health records and communications and strictly limit the disclosure of such information without consent. G.L. c. 111, § 70E; Health Insurance Portability and Accountability Act ("HIPAA"), Pub. L. No. 104-191 (1996). Regulations promulgated under HIPAA define IIHI as health information that can be linked to a specific person and PHI as IIHI that is transmitted by or maintained in electronic media as well as any other form or medium. *See* 45 C.F.R. § 46.160.103.

4. Sturdy's purpose in intercepting and disclosing to Google the contents of patient communications on the Sturdy Website was so that those third parties could sync the intercepted communications with users' online identities or profiles, which would then enable Sturdy to use Google advertising platforms to more narrowly and effectively target those patients with advertising. Sturdy had an incentive, which it acted on, to disclose private communications to Google to advance Sturdy's own marketing efforts.

5. Sturdy deployed throughout its medical website system Google Analytics, invisible programming code that tracks users' actions as they navigate through the medical website. On information and belief, Sturdy deployed this version of Google's tracker for a period of years, until it stopped using this version sometime in July 2024, after this lawsuit was filed.

6. Google Analytics is a web analytics service offered by Google. Google Analytics tracks both the patients' general search activity and their particular searches

for medical providers. Sturdy shares this activity along with the patients' IP addresses and other identifying information directly with Google, disclosing the patients' PHI and IIHI.

7.      Sturdy does not obtain patients' consent to share their PHI and IIHI and in fact does not disclose to its patients that it shares their information with Google.

8.      Google receives and stores the contents of patient communications with Sturdy as they occur in real time, possibly before the full response from Sturdy has even appeared on the patient's computing device.

9.      This contemporaneous sharing of patients' PHI and IIHI violates Plaintiff's and Class Members' rights as patients and their reasonable expectations of privacy. It also breaches the express and implied promises Sturdy makes to patients.

10.     Sturdy recognizes its duties and assures visitors to its website that it is "required by law to maintain the privacy and security of your protected health information." Sturdy further promises that it "will not use or share your information other than as described herein unless you inform us in writing that we can do so."[1]

11.     These assurances are false and misleading. In fact, Sturdy disregards its duties, internal policies, and the laws that prohibit disclosures of patient PHI/IIHI.

12.     Sturdy routinely disclosed such PHI/IIHI by using various digital marketing and automatic re-routing tools on its website. Via these tools, Sturdy purposefully and intentionally discloses its patients' PHI/IIHI to third parties. In turn,

---

[1] https://www.sturdyhealth.org/app/files/public/163a456d-fcd7-43e3-8a49-da172f497338/HIPAA.pdf

these third parties exploit that information, and use it for advertising. By using these tools, Sturdy took its patients' confidential communications and PHI and IIHI and automatically sent that information to Google—violating its patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and Sturdy's express and implied promises of patient privacy.

13.   Plaintiff Deborah Caine seeks compensatory and statutory damages and injunctive relief on her own behalf and that of a class of similarly situated Massachusetts residents to remedy Sturdy's violations of law.

**Parties**

14.   Sturdy Memorial Hospital, Inc. ("Sturdy") is an integrated health system that offers hospital-based care, emergency and urgent care, primary care, and a wide range of specialty care services at 32 locations in Southeastern Massachusetts.

15.   Sturdy is a corporation registered under the laws of Massachusetts and headquartered in Attleboro, Massachusetts.

16.   Deborah Caine is a resident of Attleboro, Massachusetts, and was a patient of Sturdy at all times material to this matter.

**Jurisdiction**

17.   This Court has subject matter jurisdiction over this action pursuant to G.L. c. 212, § 3 because this action seeks damages greater than $25,000.

18.   This Court has personal jurisdiction over Sturdy pursuant to G.L. c. 223A, § 3 because Sturdy is licensed to do business in the Commonwealth of Massachusetts, has offices in and transacts substantial business here and this action arises from

4

Sturdy's contracting to supply services and things including, but not limited to, health care services, within the Commonwealth and causing tortious injury within the Commonwealth.

19.    Venue is proper in this county pursuant to Superior Court Administrative Directive No. 24-1, which allows Plaintiff to file this action in the Business Litigation Session sitting in Suffolk County.

**Facts**

**Sturdy's System**

20.    Sturdy operates thirty-two health care facilities in Massachusetts. *See* [Locations & Clinics](). It "opened its doors in 1913 as a 15-bed hospital in the former mansion of James and Ada Sturdy." *See* [About Us]().

21.    Sturdy now serves over 300,000 patients annually, including over 7,500 inpatients at Sturdy Memorial Hospital. *Id.*

22.    Sturdy employs over 2,000 health care professionals and invests over $220 million in their salary and benefits annually, as well as $16 million annually in "uncompensated care." *Id.*

**Sturdy Shared Ms. Caine's Private Health Information with Google Without Her Knowledge or Consent**

23.    Ms. Caine was a Sturdy patient from the 1990s through July 2023. She received medical treatment from Sturdy at its North Attleboro Medical Center location. While she was a patient Ms. Caine used Sturdy's website frequently for purposes that included searching for information and resources related to medical conditions and treatment. While a Sturdy patient Ms. Caine searched Sturdy's website specifically to

5

identify and locate doctors at Sturdy's North Attleboro Medical Center facility and for other pertinent information concerning women's health and other medical issues.

24.    Ms. Caine's searches of Sturdy's website to identify and locate doctors and for other healthcare information included searches for her own healthcare and for others to whom she was providing assistance as a mental health therapist licensed by the State of Massachusetts. Ms. Caine searched Sturdy's website for healthcare information for herself and others beginning in the early 2000's and extending through 2024.

25.    For example, Ms. Caine researched Sturdy's website multiple times beginning in or about October 2021 and extending through 2021 to identify and locate a new primary care physician. Based on those searches, Ms. Caine identified ███████ ███████████████████████████████ among others, and researched their respective medical training, areas of specialty and patient care philosophies among other things. Based on that research, Ms. Caine used ████████ for her primary care physician from in or about November of 2020 through June of 2021.

26.    Ms. Caine searched Sturdy's website multiple times in the early 2020s involving ███████████████████████████ issues and searched for physicians for those specialties as well as primary doctors.

27.    Sturdy transmitted these searches to Google in real time, so that Google received individualized records associating Ms. Caine's IP address and device identifiers with those specific health conditions and providers.

28.    Ms. Caine searched Sturdy's website multiple times in the first quarter of

2021 to identify ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ and searched

Sturdy's website for further information concerning what procedures and other ████

████ they offered in office.  In addition, Ms. Caine frequently used the search feature on

the website to stay up to date regarding her medical conditions, to identify other Sturdy

doctors to help with the specific medical issues she is facing and to search for additional

primary care providers. For instance, in or about July 2023, Ms. Caine used the Sturdy

website on multiple occasions to search for a new primary care provider for herself as

she had decided to change providers. Ms. Caine similarly searched Sturdy's website

from 2020 through 2024 to keep updated on ████████████████████████████

█████████████████████████████ among other things.

29.     For example, Ms. Caine searched Sturdy's website multiple times for

information on Sturdy's HeartFITT Program, a cardiac rehabilitation program, for the

cardiac care of others to whom she was providing assistance, particularly in the period

beginning in or about 2018 through 2024.

30.     Ms. Caine also searched Sturdy's website to identify and locate

███████████████████████ offerings for other individuals she was assisting. For

example, one individual Ms. Caine had been assisting in this period is a female who

then was in her 70's that had a ████████████████████████████. Ms. Caine

searched Sturdy's website multiple times from 2018 through 2024 to obtain Information

about Sturdy's ████████ doctors and Sturdy's ████████ rehabilitation program.

Among other potential providers, Ms. Caine also obtained information specifically about Sturdy ███████████████████████████████████████████████████, and discussed that information with this individual. That individual also used that information to schedule and attend appointments with ███████████████████████ ███████████████████████ and to obtain medication among other things.

31.    For another example, Ms. Caine searched Sturdy's website multiple times for information on ███████████████████ treatment options and support groups for others she was assisting. One individual is a female then in her 60's who Ms. Caine began assisting in or about April 2023. Approximately eight years earlier, this individual had ███████████████████. Through her searches of Sturdy's website, Ms. Caine learned of Sturdy physician ████████████████████████ ███████████ and a Sturdy-led physical appearance and exercise group. Ms. Caine also discussed those findings with this individual who also in turn pursued further medical care at Sturdy.

32.    Beginning in 2020 and extending through 2024, Ms. Caine searched Sturdy's website multiple times for information on ███████████ for two other persons who she was helping as a licensed mental health therapist. One was a female in her 60's who had ████████████. Ms. Caine learned from her Sturdy website searches of █████████████████████████████████ and shared and discussed that information with this individual, who also then pursued further medical care at Sturdy. Ms. Caine also searched Sturdy's website multiple times from 2020 to 2021 when working to assist another female in her 50's with ████████████ and

discussed her findings with that individual. That individual already was a patient of ███ ██████ at the time she consulted with Ms. Caine.

33.     Beginning at least by 2018 and extending through 2024, Ms. Caine searched Sturdy's website multiple times for information on ██████ for certain individuals she was also assisting as a licensed mental health therapist. For example, one individual Ms. Caine searched Sturdy's website to assist was a ██████ in need of food nutrition, weight loss and other related counseling. Ms. Caine learned of Sturdy ████████████████ from her searches of Sturdy's website and discussed that and other information with this individual, who then proceeded to pursue medical treatment at Sturdy.

34.     Ms. Caine searched Sturdy's website multiple times in the period from at least 2018 through 2024 for information on health insurance resources, financial assistance for patients facing significant medical bills and assistance with MassHealth for several individuals and shared and discussed her findings with those individuals. One client was a female in her 40's who had ████████████████ issues and had lost her health insurance. Another was a male in his 30's who suffered from ██████████ ████████████████ issues who also had lost his insurance amid the COVID pandemic in or about 2022. Ms. Caine successfully assisted both individuals in restoring their health insurance.

35.     In or about January 2020 through 2024 Ms. Caine also searched Sturdy's website multiple times for ████████████████████████████████, family members and other individuals to whom she was providing counseling services. Ms.

9

Caine obtained information from those searches concerning █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████    One individual with whom Ms. Caine shared and discussed this information in

or about December 2023 was a female in her 50's whose mother was hospitalized with

█████ and needed to know visitation practices and policies. Another was in her 80's

who needed assistance with primary care and therefore wanted more information about

hospital ██████-related policies and guidelines.

36.    Ms. Caine also searched Sturdy's website multiple times from 2018

through 2024 for █████████ healthcare for certain individuals. One was a female

in her 40's who had ██████████; another was a male in his 60's who had

█████████████; another was a male in his 50's also with █████████; and another

had █████████████ and a car accident. Ms. Caine shared and discussed

information with these individuals and many others based in material part on what she

learned from Sturdy's website. Among other things, Ms. Caine specifically learned from

those searches of Sturdy █████████████████████████████████████

██████████████, and also discussed these potential providers with the individuals

she was assisting as alleged above. There were at least six such individuals Ms. Caine

was assisting with █████████ issues who made appointments and visited one or

both of ███████████████ as a result. Ms. Caine also discussed ████

█████████ related issues with these individuals.

37.    These searches showed what medical conditions, medications and doctors

10

were relevant to Ms. Caine and thereby disclosed her private health information. Ms. Caine reasonably believed that her searches and interactions on Sturdy's website would remain confidential and that her sensitive health information and the searches she did on behalf of the individuals she was assisting would not be disclosed to third parties. Sturdy nevertheless transmitted and otherwise shared Ms. Caine's search information with Google without Ms. Caine's knowledge or consent, including but not limited to the many specific examples detailed above.

38.     The medical issues described later appeared as targeted ads in Ms. Caine's social media accounts, including Facebook, and appeared as pop-ups when she searched the internet via Google for unrelated issues.

39.     For example, Ms. Caine began receiving ads particularly beginning in the period at least as early as 2018 and continuing through 2024 related to medicines, medical devices and other products linked directly to healthcare searches she had done on Sturdy's website for herself and certain other individuals she was assisting as alleged above. Ms. Caine saw these ads on Facebook, Google and Yahoo mail.

40.     One such series of ads was for ███████████████ . Others included ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ and other related products and services; and ████████████████ and other products.

41.     Ms. Caine routinely received numerous pop-up advertisements for medications for ████████████████████████████████████ and

various ▮▮▮▮▮▮▮ issues through Google and/or Facebook.

42.    These targeted ads were derived from information that Sturdy shared with Google,  enabling Sturdy to monetize Ms. Caine's sensitive data without her knowledge or informed consent.

43.    On information and belief, Sturdy transmitted to Google all of Ms. Caine's website interactions and searches, including: (1) her sensitive health information described above, and (2) her personally identifiable Internet Protocol (IP) address, without her authorization or consent. Ms. Caine neither knew nor had any reasonable basis to know that Sturdy was disclosing her PHI and IIHI to Google. Ms. Caine first became aware of Sturdy's unauthorized disclosures of her PHI and IIHI immediately preceding the filing of her initial Complaint in this litigation.

44.    As a result of Sturdy's unauthorized disclosures to Google, Ms. Caine has been subjected to targeted digital advertisements specifically relating to her medical conditions, including advertisements concerning her confidential health diagnoses and treatments.

45.    Ms. Caine's PHI, IIHI, and medical website search history constitute private, confidential information that requires explicit authorization prior to any third-party disclosure. Ms. Caine suffered emotional distress upon discovering Sturdy's unauthorized transmission of her confidential health information to Google.

46.    Upon information and belief Google compensated Sturdy for the disclosures of Ms. Caine's PHI and IIHI (and that of putative Class Members) in the form of enhanced marketing services.

12

47.     Sturdy profited from its sharing of Ms. Caine's information.

48.     Sturdy violated Ms. Caine's rights to privacy in her personally identifiable, sensitive, confidential medical communications.

### Common Allegations

**Sturdy Routinely Shared Plaintiff's and Class Members' Private, Confidential Health Information with Third-Party Advertising Company Google Without Disclosure or Consent**

49.     As Sturdy recognizes, healthcare systems have a duty to refrain from making unauthorized disclosures to third parties about their patients' nonpublic medical information.

50.     Patients are aware of the promises of confidentiality contained within the Hippocratic Oath and are guarded against unauthorized disclosures of their private medical information by statutory, regulatory, and common law protections afforded them under the law.

51.     Patients reasonably expect that healthcare providers will meet these confidentiality promises, obligations, and protections when patients seek medical care.

52.     Medical patients like Plaintiff and the Class have legal and financial interests in preserving the confidentiality of their communications with healthcare providers.

53.     Patients also have reasonable expectations of privacy that their PHI/IIHI and communications will not be disclosed to third parties without their express written consent and authorization.

54.     As a health care provider, Sturdy has fiduciary, common law, and

13

statutory duties to protect the confidentiality of patient information and communications.

55.    Sturdy expressly and impliedly promises patients that they will maintain and protect the confidentiality of patient PHI/IIHI and communications.

**Sturdy's Medical Website System**

56.    Sturdy operates a website for its patients, with the address of www.sturdyhealth.org.

57.    Sturdy's decision to deploy Google Analytics on its medical website—and to configure it without IP anonymization—was purposeful, not accidental or incidental to its medical operations.

58.    Sturdy contracted with Google specifically to obtain behavioral data about its patients for the purpose of enabling targeted advertising and improving Sturdy's ability to market its medical services to prospective and existing patients.

59.    Sturdy reviewed, approved, and implemented the Google Analytics configuration, including the deliberate decision to withhold the IP anonymization parameter, because doing so maximized the granularity and commercial utility of the patient data transmitted to Google.

60.    Sturdy made these configuration decisions for the purpose of acquiring individually identifiable patient data—including PHI and IIHI—to be used for commercial advertising and marketing benefit.

61.    Sturdy was aware, before and during its use of Google Analytics on its medical website, that its configuration would result in the transmission of patient PHI

and IIHI to Google, and the use of that data by Google and Facebook to better target its advertising.

62.     The U.S. Department of Health and Human Services Office for Civil Rights issued a bulletin in December 2022 expressly warning hospitals and health systems that tracking technologies, including Google Analytics, deployed on patient-facing websites could result in impermissible disclosures of PHI to tracking technology vendors, although that guidance was later curtailed after a court struck down part of it.

63.     Nevertheless, Sturdy, as a sophisticated health care system employing over 2,000 professionals, was or should have been aware of this guidance. Notwithstanding that awareness, Sturdy did not remove Google Analytics from its medical website, did not enable IP anonymization, and did not obtain patient authorizations—because its purpose was to continue acquiring and transmitting patient data to Google for commercial gain.

64.     Sturdy's purpose in acquiring and transmitting patient PHI/IIHI without authorization was commercial. In exchange for enabling Google to receive and process patient health data, Sturdy obtained enhanced marketing services from Google— including retargeting capabilities, audience analytics, and advertising optimization tools—that Sturdy used to drive patient volume and revenue to its medical facilities.

65.     These commercial benefits were the intended purpose of Sturdy's Google Analytics deployment, not a byproduct of it. Sturdy thus purposefully acquired and transferred, without consent, patient IIHI for commercial advantage within the meaning of 42 U.S.C. § 1320d-6(b), which imposes enhanced criminal penalties where the offense

15

is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage or personal gain.

66.     Sturdy also purposefully intruded upon its patients' seclusion. Patients who visit a hospital's medical website to research sensitive health conditions, identify physicians for specific ailments, or manage their care through a patient portal have a well-recognized and objectively reasonable expectation of privacy.

67.     Sturdy was aware of this expectation—its own privacy notices expressly promised confidentiality. Nevertheless, Sturdy deliberately embedded software designed to intercept and transmit the contents of those private interactions to a third-party commercial entity in real time, while those interactions were ongoing, and then use that content for marketing.

68.     Sturdy did not employ a passive data collection mechanism incidental to the operation of its website; it was instead an affirmative, purposeful technical configuration to capture and redirect patient communications to Google as they occurred, without first obtaining authorization.

69.     Sturdy thus purposefully intruded upon the seclusion patients reasonably expected their medical website interactions to enjoy.

70.     Sturdy's website allows patients to communicate with it, including to schedule appointments, search for doctors, pay bills, request medical records, and research medical issues and treatment options.

71.     Sturdy encourages patients to use the digital tools on its website to seek and receive health care services, claiming that it is an easier and more convenient way

to request appointments, pay bills, and reach doctors.

72. The home page of Sturdy's website provides links to tools to seek medical treatment, find a doctor, and other information.

73. Sturdy also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, pay bills and exchange communications with health care providers.

74. Patients transmit their medical information through the website, including private and confidential information regarding their medical conditions and treatment.

75. For a substantial period of time, source code on Sturdy's website caused these communications to be intercepted and disclosed to third parties like Google. When Sturdy patients used these online services, Sturdy surreptitiously shared their private health information with Google without their knowledge or consent, including but not limited to:

- The types of medical treatment patients are seeking;

- The name, gender, specialty, and address of the physician(s) from whom patients are seeking treatment;

- The clinic locations and events patients are seeking;

- The dates and times when patients log in to the patient portal;

- The dates and times when patients click to call doctors; and

- Patients' search terms.

76. Sturdy disclosed its patients' IP addresses to Google, along with the above-referenced information. An IP address is a number that identifies a specific

device connected to the Internet and its geolocation. HIPAA defines IP addresses as personally identifiable data. *See* 45 C.F.R. § 164.514(b)(2)(i)(0).

77.     Sturdy's website sent this patient information to Google using "Google Analytics," a web analytics service, which Sturdy has intentionally installed on its website. The software loads the moment a user visits a webpage and is designed to be invisible to regular website users. It can only be detected by accessing the webpage's source code. Google Analytics software enables website owners to track visitor actions on their website to gain valuable data about website usage, and also so the visitors can be targeted with personalized advertisements either by the website owners or by Google more generally.

78.     Among other information about a website user's browsing activity, device and browser, Google Analytics collects IP addresses of individual website users. The IP addresses enable Google to identify the person whose sensitive health data and information Sturdy is transmitting to Google via Google Analytics while that individual browses and interacts with the website. The Google Analytics software also identifies the person using Sturdy's website through other means, including through their browser identifiers, device identifiers, and cookies. Google uses the information that Sturdy discloses to identify specific patients' actions on Sturdy's website.

79.     Google Analytics offers website owners an opt-in IP anonymization feature. According to Google, this feature is designed to help website owners comply with their own privacy policies and the recommendations of data protection authorities. If a website owner enables the "Anonymize IP" feature, an additional parameter is

18

added to the communications between website visitors' computers and the Google

Analytics server, defined as aip=1 (see below).



80.    When the "aip" parameter does not appear, the IP address is not

anonymized, therefore allowing Google to identify the patients' IP address and their

online actions.

81.    Sturdy does *not* enable the "Anonymize IP" feature on its website, as

evidenced by the absence of the "aip" parameter (see below).

```
Protocol: https
    Host: www.google-analytics.com
    Path: /j/collect
PARAMETERS
        v: 1
       _v: j101
        a: 329231644
        t: pageview
       _s: 1
       dl: https://www.sturdyhealth.org/home-page/
       ul: en-us
       de: UTF-8
       dt: Sturdy Memorial
       sd: 30-bit
       sr: 1728x1117
       vp: 1728x995
       je: 0
       _u: QACAAEABAAAAACAAI~
      jid:
     gjid:
      cid: 364006939.1697726092
      tid: UA-52979485-1
     _gid: 1739748149.1697959582
     _slc: 1
      gtm: 45He3ai0n81WWKK6KV
        z: 173894607
```

82.     By using the Google Analytics tool without the "Anonymize IP" feature, Sturdy is sharing with Google patients' online activities relating to their private medical treatment, along with their IP addresses, even with respect to patients who have not agreed to share such information.

83.     Sturdy shared this patient information with Google for marketing purposes. Google is essentially an advertising company that uses patient information to target advertisements to patients. Sturdy shares patient information with Google in

order to obtain marketing and analytics benefits from Google.

**Example of Patient Medical Website Visit**

84.    Sturdy patients can search for a provider by clicking "Find a Provider" in

the upper left corner of the website's homepage (see below).



85.    When patients search for a doctor's name or specialty through the free text

search bar, this information is automatically sent directly to Google (see below).



21



86.    As shown in the images below, Sturdy's website transmitted to Google the patient's search for "plastic surgery" as a free text keyword, and the patient's search for a doctor named David Barrall.

```
Protocol: https
    Host  www.google-analytics.com
    Path: /collect
PARAMETERS
        v: 1
       _v: j101
        a: 860257746
        t: pageview
       _s: 1
       dl: https://www.sturdyhealth.org/find-a-provider/search-results/?sort=7
           &keyword=plastic+surgery
       ul: en-us
       de: UTF-8
       dt: Find a Provider Search Results | Sturdy Memorial Hospital | Attlebo
           ro, MA
       sd: 30-bit
       sr: 1728x1117
       vp: 1728x995
       je: 0
       _u: QACAAEABAAAAACAAI~
      jid:
     gjid:
      cid: 364006939.1697726092
      tid: UA-52979485-1
     _gid: 1739748149.1697959582
      gtm: 45He3ai0n81WWKK6KV
        z: 839950341
```

22

```
Protocol: https
    Host www.google-analytics.com
    Path: /collect
PARAMETERS
     v: 1
    _v: j101
     a: 1660168751
     t: event
    ni: 0
    _s: 1
    dl: https://www.sturdyhealth.org/find-a-provider/search-results/?sort=7
        +keyword=+David+Barrall
    ul: en-us
    de: UTF-8
    dt: Find a Provider Search Results | Sturdy Memorial Hospital | Attlebo
        ro, MA
    sd: 30-bit
    sr: 1728x1117
    vp: 1728x995
    je: 0
    ec: Outbound Link
    ea Find a Provider
    el: Click URL - https://www.sturdyhealth.org/find-a-provider/
    _u: SACAAEABAAAAACAAI~
   jid:
  gjid:
   cid: 364006939.1697726092
   tid: UA-52979485-1
  _gid: 1739748149.1697959582
   gtm: 45He3ai0n81WWKK6KV
     z: 1236365182
```

87.    Patients can also use the Advanced Search option, which can search for doctors using additional filtering options such as name, gender, specialty, and location (see below).



88.    When patients submit their search criteria, Sturdy's website automatically sends that information directly to Google. As shown below, the website transmitted to Google the patient's search for a female doctor named Barbara, near the address 1116 County St Attleboro 02703, and that the patient viewed the profile page for physician assistant Barbara Baxter (see below).

```
Protocol: https
    Host: www.google-analytics.com
    Path: /collect
PARAMETERS
        v: 1
       _v: j101
        a: 1076898063
        t: event
       ni: 0
       _s: 1
       dl: https://www.sturdyhealth.org/find-a-provider/search-results/?first=
           Barbara&gender=Female&userEnteredPosition=1116+County+St+Attleboro+
           02703&sort=7&page=1
       ul: en-us
       de: UTF-8
       dt: Find a Provider Search Results | Sturdy Memorial Hospital | Attlebo
           ro, MA
       sd: 30-bit
       sr: 1728x1117
       vp: 1728x909
       je: 0
       ec: Advanced Provider Search
       ea: First Name
       el: barbara
       _u: QACAAEABAAAAACAAI~
      jid:
```

```
Protocol: https
    Host: www.google-analytics.com
    Path: /j/collect
PARAMETERS
        v: 1
       _v: j101
        a: 1156560821
        t: pageview
       _s: 1
       dl: https://www.sturdyhealth.org/find-a-provider/profile/barbara-baxter/
       ul: en-us
       de: UTF-8
       dt: Barbara Baxter, PA-C | OB/GYN Associates of Attleboro | Attleboro, MA
       sd: 30-bit
       sr: 1728x1117
       vp: 1728x909
```

25



89.    Sturdy patients can also search for medical services by clicking on the medical services search bar on the website's homepage.



90.    As shown in the images below, Sturdy's website transmitted to Google that the patient searched for "hiv" as a free text keyword, and also viewed the Infectious Disease page.

```
Protocol: https
    Host: www.google-analytics.com
    Path: /j/collect
PARAMETERS
      v: 1
     _v: j101
      a: 1126632638
      t: event
     ni: 0
     _s: 1
     dl: https://www.sturdyhealth.org/medical-services/search-results/?keyword=hiv&sort=9&page=1
     ul: en-us
     de: UTF-8
     dt: Medical Services Search Results | Sturdy Memorial Hospital | Attleboro, MA
     sd: 30-bit
     sr: 1728x1117
     vp: 1728x909
     je: 0
     ec: Advanced Services Search
     ea: hiv
     _u: QACAAEABAAAAACAAI~
     jid: 1064197225
```

```
Protocol: https
    Host: www.google-analytics.com
    Path: /collect
PARAMETERS
      v: 1
     _v: j101
      a: 1937126755
      t: event
     ni: 0
     _s: 1
     dl: https://www.sturdyhealth.org/medical-services/search-results/?keyword=hiv&sort=9&page=1
     ul: en-us
     de: UTF-8
     dt: Medical Services Search Results | Sturdy Memorial Hospital | Attleboro, MA
     sd: 30-bit
     sr: 1728x1117
     vp: 1728x909
     je: 0
     ec: Outbound Link
     ea: Infectious Disease
     el: Click URL - https://www.sturdyhealth.org/medical-services/infectious-disease/
     _u: SACAAEABAAAAACAAI~
     jid:
     gjid:
```

91.     As shown in the images below, patients can search for locations and

clinics, and for classes and events on the website's homepage.





92.     As shown in the images below, Sturdy's website transmitted to Google that the patient searched for clinics near the address 1116 County St Attleboro 02703, and that the patient searched for Support Groups in the Classes & Event page.

```
Protocol: https
    Host: www.google-analytics.com
    Path: /collect
PARAMETERS
        v: 1
       _v: j101
        a: 1275396608
        t: event
       ni: 0
       _s: 1
       dl: https://www.sturdyhealth.org/locations-clinics/search-results/?user
           EnteredPosition=1116+County+St+Attleboro+02703&sort=13&page=1
       ul: en-us
       de: UTF-8
       dt: Locations & Clinics Search Results | Sturdy Memorial Hospital | Att
           leboro, MA
       sd: 30-bit
       sr: 1728x1117
       vp: 1728x995
       je: 0
       ec: Advanced Location Search
       ea: Radius
```

30



```
Protocol: https
    Host: www.google-analytics.com
    Path: /j/collect
PARAMETERS
      v: 1
     _v: j101
      a: 2035503703
      t: pageview
     _s: 1
     dl: https://www.sturdyhealth.org/classes-events/search-results/?keyword
         s=Support+Group
     ul: en-us
     de: UTF-8
     dt: Classes & Event Search Results | Sturdy Memorial Hospital | Attlebo
         ro, MA
     sd: 30-bit
     sr: 1728x1117
     vp: 1728x995
```

93.    Moreover, any information patients submit through the search bar (*e.g.*, doctor, specialty, type of treatment) on the website's homepage is shared with Google, along with patients' IP addresses.



32



94.    As shown in the image below, Sturdy Health's website transmitted to Google that the patient searched for "addiction," and that the patient clicked on the substance abuse page.

32



```
Protocol: https
    Host: www.google-analytics.com
    Path: /collect
PARAMETERS
        v: 1
       _v: j101
        a: 1607586321
        t: event
       ni: 0
       _s: 1
       dl: https://www.sturdyhealth.org/site-search/?term=addiction
       ul: en-us
       de: UTF-8
       dt: Site Search | Sturdy Memorial Hospital | Attleboro, MA
       sd: 30-bit
       sr: 1728x1117
       vp: 1728x995
       je: 0
       ec: Outbound Link
       ea: Substance Abuse and Opioid Addiction Treatment
       el: Click URL - https://www.sturdyhealth.org/medical-services/substance-abuse/
       _u: SACAAEABAAAAACAAI~
```

95.    Sturdy patients can also log in to the Patient Portal through the website (see below).





96.     As shown in the image below, Sturdy's website transmitted to Google that the patient clicked on the log-in button to the patient portal.

```
Protocol: https
    Host: www.google-analytics.com
    Path: /j/collect
PARAMETERS
      v: 1
     _v: j101
      a: 920900302
      t: event
     ni: 0
     _s: 1
     dl: https://www.sturdyhealth.org/patient-portal/
     ul: en-us
     de: UTF-8
     dt: Patient Portal
     sd: 30-bit
     sr: 1728x1117
     vp: 1713x909
     je: 0
     ec: Outbound Link
     ea: Log In Here
     el: Click URL - https://cernerhealth.com/oauth/authenticate?redirect_u
         ri=https%3A%2F%2Fcernerhealth.com%2Fsaml%2Fsso%2Fresponse%3Fmessag
         e_id%3D_db449b47-18d8-469c-8c80-19def72db78b%26issuer%3Dhttps%253
         A%252F%252Fsturdymemorial.iqhealth.com%252Fsession-api%252Fprotoco
         l%252Fsaml2%252Fmetadata&sign_in_only=on&client_id=e16d380b950c4dd
         7a34077fac3e4eb4e
```

34

97.     Sturdy patients can also use its website to contact doctors they find during their searches (see below).



98.     As shown in the image below, when patients click the telephone number button to call a doctor's office, Sturdy's website immediately shares that information with Google.

```
Protocol: https
    Host: www.google-analytics.com
    Path: /collect
PARAMETERS
      v: 1
     _v: j101
      a: 2032595894
      t: event
     ni: 0
     _s: 1
     dl: https://www.sturdyhealth.org/find-a-provider/search-results/?gende
         r=Female&sort=7&page=1
     ul: en-us
     de: UTF-8
     dt: Find a Provider Search Results | Sturdy Memorial Hospital | Attleb
         oro, MA
     sd: 30-bit
     sr: 1728x1117
     vp: 1713x909
     je: 0
     ec: Phone Number
     ea: 508-316-1001
     el: Page Path - /find-a-provider/search-results/
```

99.     Every communication exchanged between patients and Sturdy's website contemporaneously and automatically shares patients' personally identifiable data including their IP addresses and the content of their communications with Google.

**Google Analytics**

100.    Google Analytics is a web analytics service that allows website owners to track visitor actions on their website to target them with personalized advertisements.

101.    Google Analytics is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in." Christopher Mims, 2018, *Who Has More of Your Personal Data than Facebook? Try Google,* Wall Street Journal, April 22, 2018.

**Sturdy Ignored Google's Prohibition on Using Its Marketing Tools on Healthcare Related Websites**

102.    Google warns developers in its Personalized Advertising policies page that "Health" in personalized advertising is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting....

103.    "Advertisers can't use sensitive interest categories to target ads or to promote advertisers' products or services." Customer Match policy. "Health" is one such "[p]rohibited categor[y]" that Google says it does not allow advertisers to target ads to users or promote advertisers' products or services. Personalized advertising.

36

You are responsible for ensuring your ads comply with policy where required. See below for specific examples of what we don't allow.

## Health in personalized advertising

❌ Personal health content, which includes:

- Physical or mental health conditions, including diseases, sexual health, and chronic health conditions, which are health conditions that require long-term care or management
- Products, services, or procedures to treat or manage chronic health conditions, which includes over-the-counter medications and medical devices
- Any health issues associated with intimate body parts or functions, which includes genital, bowel, or urinary health
- Invasive medical procedures, which includes cosmetic surgery, surgical procedures, or injections
- Disabilities, even when content is oriented toward the user's primary caretaker

104.    Google provides instructions for web developers to anonymize IP addresses when they use Google Analytics. The IP anonymization feature "is designed to help site owners comply with their own privacy policies, or, in some countries, recommendations from local data protection authorities, which may prevent the storage of full IP address information." IP masking in Universal Analytics. Web developers may also affirmatively choose to *not* use the IP anonymization feature—which is what Sturdy did here.

**The Nature and Means of Sturdy's Unauthorized Disclosure of Patients' Health Care Information**

105.    Upon information and belief, Sturdy intercepted and disclosed the following non-public private information to Google:

>       Plaintiff's and putative Class Members' status as patients;
>
>       Plaintiff's and putative Class Members' communications with Sturdy via its website;

Plaintiff's and putative Class Members' log-ins and log-outs of Sturdy's patient portal;

Plaintiff's and putative Class Members' searches for information regarding specific medical conditions and treatments, their medical providers, booking of appointments and their physical location.

106. Sturdy's disclosures of patients' personal healthcare information occur because Sturdy intentionally deploys source code on its website that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third party Google.

107. By design, Google receives and records the exact contents of patient communications before the full response from Sturdy to patients has been rendered on the screens of patients' computer devices and while the communications between Sturdy and its patients remain ongoing.

108. Third-party advertising companies like Google then use such private information to determine that specific patients were seeking specific types of confidential medical treatment. This kind of disclosure reveals to Google that specific patients were being treated for specific types of diseases or medical conditions, such as cancer or pregnancy, and allows Google, and Sturdy, to target advertisements accordingly.

109. Websites like those maintained by Sturdy are hosted by computer servers through which the businesses in charge of the websites communicate with Internet users via the users' web browsers, which are hosted on users' client devices, such as desktop or laptop computers, tablets, or smart phones.

110. Each exchange of an electronic communication over the Internet typically consists of a Hypertext Transfer Protocol ("HTTP") request from the client device and an HTTP response from a server. When a user types a Uniform Resource Locator ("URL") into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server returns an HTTP response that consists of a web page that appears in the client device's web browser.

111. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, and often contain sensitive, personally identifiable information.

112. In turn, HTTP responses may consist, among other things, of web pages, other types of files, text information, or error codes.

113. Web pages consist primarily of "markup" and "source code." The markup of a web page comprises the visible portion of the web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos. The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

114. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmed instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server or, as is the case with Sturdy's website, to third parties.

115. For example, Sturdy's website includes software code that transmits

HTTP requests *directly* to Google, including patients' private health information, every time patients interacted with pages on the website.

116.    The basic command that web browsers use to exchange data and user communications is called a GET request. HTTP Request Methods. For example, when a patient types "heart failure treatment" into the search box on Sturdy's website and hits "Enter," the patient's web browser makes a connection with the server for Sturdy's website and sends the following request: "GET search/q=heart+failure+treatment."

117.    When a server receives a GET request, the information becomes appended to the next URL accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

118.    The other basic transmission command utilized by web browsers is POST, which typically occurs when a user enters data into a form on a website and clicks "Enter" or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

119.    In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

120.    Once the initial connection is made between a user and a website, the

40

communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

121.    Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties via third-party tracking tools. As noted, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google. Best practices to avoid sending Personally Identifiable Information (PII).

122.    Third parties such as Google use the information they receive to track user data and communications for marketing purposes.

**Sturdy Breaches Its Privacy Policy and Other Representations by Its Undisclosed Sharing of Patient Health Information with Google Without Consent**

123.    Patients' activity on Sturdy's medical website system, including pages accessed and links clicked, are private communications patients direct to Sturdy. By embedding the Google Analytics source code into its medical website system, Sturdy is disclosing to Google the contents of those communications.

124.    The Terms of Use & Disclaimer page of Sturdy's website refers users "to [its] privacy statement for a complete discussion of how [Sturdy] utilizes information [users] communicate via [the] web site."

125.    Sturdy's Notice of Privacy Practices in turn provides that Sturdy "may only use or disclose your Protected Health Information when you grant us permission through your written authorization." *See also id.* ("We will not use or share your

41

information other than as described herein unless you inform us in writing that we can do so.").

126.    A short list of "cases [in which Sturdy] never share[s] your information unless you provide us with written permission" includes: "Marketing and sale of your information." *Id.* Likewise, a longer list of permissible "Uses and Disclosures" does *not* include any of the website's disclosures to Google. *Id. See also id.* ("We are required by law to maintain the privacy and security of your protected health information.").

127.    Sturdy's Patient Bill of Rights includes the right to "confidentiality of all records and communications concerning your medical history and treatment to the extent provided by law."

128.    But in direct violation of these promises, Sturdy uses Google Analytics to gather medical information about Plaintiff Deborah Caine and putative Class Members and disclose it to Google without their consent.

129.    The web pages that are being presented to patients and the patients' interactions with the website are communications between Sturdy and its patients.

130.    Sturdy allows Google to intercept those communications by embedding Google Analytics on its website.

**Sturdy Unlawfully Enriched Itself When it Disclosed Patient PHI/IIHI Unnecessarily and Without Patient Authorization**

131.    In exchange for disclosing PHI/IIHI about its patients, Sturdy is compensated by Google with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

132.    Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

133.    For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website.

134.    Once personally identifiable information relating to patient communications is disclosed to a third party like Google, Sturdy loses the ability to control how that information is subsequently disseminated and exploited.

135.    The monetization of the data being disclosed by Sturdy, both by it and Google, demonstrates the inherent value of the information being collected.

## Applicable Law

### Federal Electronic Communications Privacy Act

136.    The Electronic Communications Privacy Act, 18 U.S.C. § 2510 (the "ECPA"), protects individuals against eavesdropping committed with an improper purpose.

137.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any … electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any … electronic communication,

knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] … electronic communication" or "intentionally uses, or endeavors to use, the contents of any … electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] … electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

**Massachusetts Invasion of Privacy**

138.    G.L. c. 214, § 1B, provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such a right and in connection therewith to award damages."

139.    G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right "to confidentiality of all records and communications to the extent provided by law."

**HIPAA Requirements that Bind Sturdy**

140.    Sturdy is subject to HIPAA.

141.    HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the

44

information can be used to identify the individual." 45 C.F.R. § 160.103.

142.    The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

A. Names;
…
H. Medical record numbers;
…
J. Account numbers;
…
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
P. Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[2]

143.    The HIPAA Privacy Rule requires any "covered entity" — which includes

---

[2] *See* 45 C.F.R. § 160.514.

health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

144.    Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be PHI.

145.    HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[3]

146.    Consistent with this restriction, HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[4]

---

[3] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html,
(last visited Jan. 21, 2025).
[4] *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited January 21, 2025)

46

147.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."

148.    The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

149.    Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

150.    HIPAA also requires covered entities to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1).

151.    Under HIPAA, covered entities may not disclose PHI about a patient, potential patient or household member of a patient for marketing purposes without the

47

patient's express written authorization. See HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

**Fiduciary Duty to Maintain Patient Confidentiality**

152.   As a medical provider for Plaintiff and Class Members, Sturdy owes its patients a fiduciary duty of confidentiality in providing health care and in maintaining patients' health information.

153.   All health care providers owe their patients a duty not to disclose medical information about the patient without the patient's informed consent.

## Class Allegations

154.   The class is composed of all Massachusetts residents who:

(i)     are or were patients of Sturdy at any time after the date Sturdy initially installed Google Analytics on its website; and

(ii)    prior to Sturdy's retirement of the Google Analytics tracker described herein exchanged communications at Sturdy's website, including but not limited to searching for or communicating information concerning the symptoms, diagnosis or treatment of a medical condition, or to schedule an appointment; and

(iii)   for which Sturdy did not obtain the patient's consent under HIPAA or via any other valid form of consent.

155.   Based on the volume of patient use of Sturdy's website, the prospective class numbers more than 10,000, making joinder of all members impracticable. The exact size of the proposed class and the identity of the Class Members are readily ascertainable from Sturdy's business records.

156.   There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. The principal

48

common issues regarding the Class include whether:

    a.    Sturdy's use of Google Analytics was without patient consent or authorization;

    b.    Sturdy obtained and shared or caused to be obtained and shared Plaintiff's and Class Members' PHI and/or IIHI through tracking using Google Analytics;

    c.    Sturdy's practices relating to disclosures of Plaintiff's and Class Members' communications with Sturdy to Google attached to PHI and/or IIHI were intentional;

    d.    Sturdy profited from the disclosures to Google;

    e.    Sturdy's practices relating to disclosures of Plaintiff's and Class Members' communications with Sturdy to Google attached to PHI and/or IIHI violate 18 U.S.C. § 2511, G.L. c. 214, § 1B, and/or c. 111, § 70E;

    f.    Sturdy's practices constitute negligence, a breach of fiduciary duty, or a breach of implied contract;

    g.    Sturdy's conduct harmed and continues to harm Plaintiff and Class Members, and, if so, the extent of injury.

157.    There are no difficulties likely to be encountered by the Court in the management of this proposed class action. There are no individual questions, other than those which can be determined by ministerial inspection of Sturdy's records, and the issues of liability are determinable entirely from the face of the operative documents.

158.    Plaintiff's claims are typical of those of the Class she seeks to represent, and she will fairly and adequately protect and represent the interests of the Class. There is no conflict between Plaintiff and the proposed Class.

159.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual Class

Members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for Class Members to seek redress individually. In addition, it is likely that most Class Members are unaware that they have claims. Finally, the prosecution of separate actions by the individual Class Members, even if possible, would create a risk of inconsistent or varying adjudications regarding the individual Class Members against Sturdy.

160.    Plaintiff's counsel is competent and experienced in both consumer protection and class action litigation.

161.    Sturdy has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

### Tolling of Statutes of Limitation

162.    All applicable statutes of limitation have been tolled by Sturdy's knowing and active concealment of the facts alleged in this Amended Complaint.

163.    Sturdy seamlessly incorporated trackers into its websites, providing no indication to users that they were being tracked. Sturdy had knowledge that its websites incorporated tracking technologies yet failed to disclose that by interacting with tracking-enabled websites that Plaintiff's and Class Members' PHI and / or IIHI would be intercepted, collected, used by, and disclosed to third parties.

164.    Plaintiff and Class Members could not have reasonably discovered Sturdy's practice of sharing their PHI and/or IIHI with Google until shortly before this class action was filed.

165. Sturdy was and remains under a continuing duty to disclose to Plaintiff and Class Members its practice of sharing PHI and/or IIHI with Google.

166. As a result of Sturdy's active concealment, all applicable statutes of limitation have been tolled.

**Claims for Relief**

**Count I: Violation of the Federal Electronic Communications Privacy Act, 18 U.S.C. § 2510 (the "ECPA")**

167. Sturdy is a "party to the communication" under § 2511(2)(d) and would ordinarily avoid ECPA liability on that basis. However, Sturdy falls within the crime-tort exception because it intercepted Plaintiff's and Class Members' electronic communications for the purpose of committing criminal and tortious acts.

168. Sturdy's purpose in intercepting and redirecting patient communications to Google was the purposeful acquisition and commercial exploitation of patient IIHI for Sturdy's marketing and advertising benefit. This purpose is independently criminal under 42 U.S.C. § 1320d-6(b) because Sturdy acted with intent to transfer individually identifiable health information for commercial advantage, without authorization.

169. The purpose to acquire and transfer IIHI for commercial gain was the reason Sturdy configured and deployed Google Analytics as it did—not a consequence it was indifferent to. As Sturdy's purpose was to acquire and sell IIHI for commercial advantage — a federal crime —the crime-tort exception applies.

170. The foregoing purposeful criminal and tortious acts are not sanitized by Sturdy's concurrent lawful marketing purposes.

171.    Sturdy intentionally configured Google Analytics to maximize data capture, rejected available privacy protections, ignored warnings from HHS that such tracking tools violated HIPAA, and obtained concrete commercial consideration (enhanced marketing services) in return for the patient data it transmitted.

172.    Plaintiff's and Class Members' communications with Sturdy on its website and patient portal as described above are covered communications under the ECPA.

173.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any … electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any … electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] … electronic communication" or "intentionally uses, or endeavors to use, the contents of any … electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] … electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

174.    Plaintiff's and Class Members' communications with Sturdy through its websites constitute "electronic communications" under the Act because each communication was the transfer of data or intelligence, including, but not limited to:

    a.    the parties to the communications;

    b.    the precise text of patient search queries;

    c.    personally identifiable information such as patients' IP addresses, and other unique identifiers;

d. the precise text of patient communications about specific doctors;

e. the precise text of patient communications about specific medical conditions;

f. the precise text of patient communications about specific treatments;

g. the precise text of patient communications about scheduling appointments with medical providers;

h. the precise text of patient communications about billing and payment;

i. the precise text of specific buttons on Sturdy's website that patients click to exchange communications, including Logins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Sturdy's website;

k. the precise dates and times when patients visit Sturdy's website;

l. information that is a general summary or informs third parties of the general subject of communications that Sturdy sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Sturdy has aided third parties in scraping from webpages or communication forms at web properties.

18 U.S.C. § 2510(12).

175.    Plaintiff's and Class Members' communications with Sturdy further constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiff's and Class Members' personal computing devices;

b. Plaintiff's and Class Members' web browsers;

53

    c.  Plaintiff's and Class Members' browser-managed files;

    d.  Internet cookies;

    e.  Sturdy's computer servers; and

    f.  Third-party source code used by Sturdy.

176. To "intercept" under the statute "means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. " *Id.* § 2510(4).

177. An "intercepting device" is "any device or apparatus which can be used to intercept a wire, oral, or electronic communication…". *Id.* § 2510(5).

178. "[C]ontents" includes "any information concerning the substance, purport, or meaning of that communication." *Id.* § 2510(8).

179. Whenever Plaintiff and Class Members interacted with Sturdy's website, including its patient portal, Sturdy, through the source code it imbedded and ran on its website, contemporaneously and intentionally divulged the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

180. The "intercepting devices" used in this case include, but are not limited to:

    a.  Plaintiff's and Class Members' personal computing devices;

    b.  Plaintiff's and Class Members' web-browsers;

    c.  Plaintiff's and Class Members' browser-managed files;

d.      Internet cookies;

e.      Sturdy's own computer servers;

f.      the third-party source code embedded on Sturdy's websites; and

g.      Google's computer servers, to which Plaintiff's and Class Members'

communications were redirected.

181.   Sturdy aided in and continues to aid in the interception of contents in that the data from the communications exchanged between Plaintiff and Class Members and Sturdy that were redirected to and recorded by Google include information which identifies the parties to each communication, their existence, and the exact contents of such communications.

182.   Sturdy aided in the interception of "contents" that included the information listed in paragraph 140 above.

183.   The ECPA provides that a "party to the communication" or an entity may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

184.   Thus, although Sturdy is a "party to the communications" at issue, it is still liable under the ECPA because it captured and redirected Plaintiff's information to third parties without consent and for purposes that were tortious, criminal and designed to violate state constitutional and statutory provisions as alleged throughout this amended complaint, including:

a.      The unauthorized acquisition of individually identifiable health

55

information is tortious in and of itself regardless of whether the means deployed to acquire the information violates the Wiretap act or any subsequent purpose or use for the acquisition. Sturdy intentionally committed a tortious act by acquiring individually identifiable health information without authorization to do so;

b.   The unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health information. Sturdy intentionally violated 42 U.S.C. 1320d-6 by intentionally acquiring individually identifiable health information without authorization;

c.   A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offensive punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage provision of 42 U.S.C. § 1320d-6 by acquiring the individually identifiable [or] personal gain." Sturdy intentionally violated the enhanced penalty health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain" by bartering away patients' PHI/IIHI to third parties like Google for financial and advertising benefits; and

d.   A knowing intrusion upon Plaintiff's and Class members' seclusion.

185.   In disclosing the content of Plaintiff's and the Class Members'

communications, Sturdy's primary motive in intercepting the private health information of its users was to profit from selling it to third parties, such as Google, and for advertising and marketing purposes. Sturdy's conduct reveals its criminal and tortuous intent to profit commercially from exploiting private information in violation of HIPAA.

186.    Moreover, Sturdy's criminal and tortious conduct extends beyond the act of mere interception since Sturdy shares users sensitive health information with Google which is then used to generate revenue and marketing benefits for Google and Sturdy.

187.    As a result, Sturdy harmed Plaintiff and Class Members, violating their privacy, breaching their contract with the hospital, depriving them the full benefit of their bargain with Sturdy for care, and causing actual damages in an amount to be proven at trial.

188.    For these reasons, Plaintiff, individually, and on behalf of Class Members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

189.    The ECPA provides a civil remedy to a person whose "wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter," against "the person or entity, other than the United States, which engaged[1] in that violation," of the greater of —

> (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

(B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

18 U.S.C. § 2520(c)(2).

## Count II: Violation of the Privacy Statutes

190.    Sturdy owes Plaintiff and Class Members a duty of confidentiality.

191.    Despite its statutory duty not to disclose IIHI or PHI without informed consent, Sturdy knowingly disclosed such private information relating to Plaintiff's and Class Members' health care, treating doctors, and medical treatment to Google without their knowledge or informed consent.

192.    The information disclosed included Plaintiff's and Class Members' status as Sturdy patients and the exact contents of communications exchanged between Plaintiff or Class Members and Sturdy, including but not limited to information about log-ins to Sturdy's patient medical website, treating doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

193.    The knowing disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff's and Class Members' rights to privacy and confidentiality, in violation of G.L. c. 214, § 1B and c. 111, § 70E.

194.    Sturdy's purpose was also to intrude upon patients' seclusion—a recognized common-law tort. Sturdy affirmatively and purposefully embedded real-time interception code on a website which it promised patients to be a confidential medical portal.

195.    The configuration was designed to capture and redirect the private contents of patient-physician communications without the patient's knowledge. The purpose of that interception was to expose patients' private health communications to Google for commercial use.

196.    Sturdy has deliberately intercepted its patients' confidential medical inquiries in real time and transmitted them to an advertising platform, purposefully intruding upon the seclusion of its patients. Sturdy acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the unauthorized disclosures, thereby materially impairing any potential mitigation efforts Plaintiff and Class members could undertake.

197.    Acting with knowledge, Sturdy had notice and knew that it would injure Plaintiff and the Class by using software tools specifically designed to automatically disclose patient PHI/IIHI to third parties.

198.    As a proximate result of Sturdy's acts and omissions, Plaintiff's and Class Members' PHI/IIHI were disclosed to third parties—and is now available for further disclosure and redisclosure without authorization, further inflicting injuries on Plaintiff and the Class.

199.    Unless and until enjoined and restrained by order of this Court, Sturdy's wrongful conduct will continue to inflict irreparable injury to Plaintiff and the Class since Sturdy, upon information and belief, continues to disclose patient PHI/IIHI to third parties without patient authorization or consent.

**Count III: Negligence**

200.    Sturdy owed Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' PHI and IIHI in its care and custody, including the implementation of industry-standard privacy procedures sufficient to reasonably protect that information from the disclosure and unauthorized transmittal and use of the information that occurred.

201.    Sturdy acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' PHI and IIHI by disclosing and providing access to that information to third parties for its own financial benefit.

202.    Sturdy owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Sturdy knew or should have known would suffer injury-in-fact from Sturdy's disclosure of their PHI and IIHI to benefit third parties and itself. Sturdy actively sought and obtained Plaintiff's and Class Members' PHI and IIHI.

203.    PHI and IIHI are valuable, and Sturdy knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their PHI and IIHI to third parties. This disclosure benefitted Sturdy and third parties by virtue of their using the information for data harvesting, advertising, and to increase sales.

204.    Sturdy breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in handling and securing Plaintiff's and Class Members' PHI and IIHI. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

205. As a direct and traceable result of Sturdy's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, exposure to inappropriate advertisements, use of their PHI and IIHI for advertising purposes, and increased risk of future harm, embarrassment, and emotional distress.

206. Sturdy's breach of its common-law duties to exercise reasonable care proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, unauthorized access to their PHI and IIHI by third parties, improper disclosure of their PHI and IIHI, loss in the value of their PHI and IIHI. These injuries are ongoing, imminent, immediate, and continuing.

### Count IV: Breach of Implied Contract

207. Sturdy solicited and invited Plaintiff and Class Members to provide their PHI and IIHI on its websites as part of its regular business practices. Plaintiff and Class Members accepted Sturdy's offers and provided their PHI/IIHI to Sturdy as part of acquiring medical services. Per its contractual, legal, ethical, and fiduciary duties, Sturdy was obligated to take adequate measures to protect Plaintiff's and Class Members' PHI/IIHI from unauthorized disclosure to third parties such as Google. In so doing, Plaintiff and Class Members entered into contracts with Sturdy, pursuant to which Sturdy agreed to safeguard and protect that information, in its Privacy Policies and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data was breached, compromised and/or stolen. These facts give rise to the inference that Sturdy took on obligations

outside the plain terms of any express contracts that it may have had with Plaintiff and Class Members.

208. Plaintiff and Class Members entered into valid and enforceable implied contracts with Sturdy when they sought medical treatment from Sturdy. Specifically, through their course of conduct, Sturdy, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Sturdy to retain and protect the privacy of Plaintiff's and Class Members' PHI/IIHI.

209. Sturdy required and obtained Plaintiff's and Class Members' PHI/IIHI as part of the physician-patient relationship, evincing an implicit promise by Sturdy to act reasonably to protect the confidentiality of Plaintiff's and Class Members' PHI/IIHI. Sturdy, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly promised that it would safeguard Plaintiff's and Class Members' PHI/IIHI in exchange for access to that information and the opportunity to treat Plaintiff and Class Members.

210. Implicit in the agreement between Sturdy and its patients (i.e., Plaintiff and Class Members) was the obligation that Sturdy and its business associates would maintain the PHI and IIHI confidentially and securely, and this information would not be shared with third parties such as Google without the knowledge or consent of Plaintiff and Class Members. By asking for and obtaining Plaintiff and Class Members' PHI/IIHI, Sturdy assented to protecting the confidentiality of that information. Sturdy's implicit agreement to safeguard the confidentiality of Plaintiff's and Class Members'

PHI/IIHI was necessary to effectuate the contract between the parties.

211. Sturdy had an implied duty of good faith to ensure that Plaintiff's and Class Members's PHI and IIHI in its possession was only used as authorized, such as to provide medical treatment, billing, and other medical benefits.

212. Sturdy had an implied duty to protect Plaintiff's and Class Members' PHI and IIHI from unauthorized disclosure or uses.

213. Sturdy implicitly promised to keep its patients' PHI and IIHI secure and confidential.

214. Plaintiff and Class Members provided their PHI/IIHI in reliance on Sturdy's implied promise that this information would not be shared with third parties without their consent.

215. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiff and Class Members would provide their PHI/IIHI in exchange for the medical treatment and other benefits provided by Sturdy (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiff and Class Members made to Sturdy for medical services was intended to ensure the confidentiality of their PHI/IIHI.

216. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Sturdy would comply with their promises to protect the confidentiality of their PHI/IIHI as well as applicable laws and regulations governing the disclosure of such information and that Sturdy would not allow third parties to collect or exploit their communications with Sturdy without their consent.

63

217. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiff and Class Members would not have disclosed their PHI/IIHI to Sturdy but for the prospect of Sturdy's promise of medical treatment and other benefits and reasonable expectation that Sturdy would not disclose to third parties their private medical information.

218. Sturdy was therefore required to reasonably safeguard and protect the PHI/IIHI of Plaintiff and Class Members from unauthorized disclosure and/or use by third parties.

219. Plaintiff and Class Members accepted Sturdy's medical services and fully performed their obligations under the implied contract with Sturdy, but Sturdy did not. Plaintiff and Class Members would not have provided their PHI and IIHI to Sturdy in the absence of their implied contracts with Sturdy that the information would be kept in confidence and would instead have retained the opportunity to control their PHI and IIHI for uses other than receiving medical treatment from Sturdy.

220. Both the provision of medical services healthcare and the protection of Plaintiff's and Class Members' PHI/IIHI were material aspects of these implied contracts.

221. Sturdy breached its implied contracts with Plaintiff and Class Members by disclosing Plaintiff's and Class Members' PHI and IIHI to unauthorized third parties.

222. Sturdy's acts and omissions have materially affected the intended purpose of the implied contracts that required Plaintiff and Class Members to disclose their PHI and IIHI in exchange for medical treatment and benefits.

223.    Additionally, Sturdy's express representations, including, but not limited to the express representations found in their Privacy Policies and Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Sturdy to refrain from aiding or allowing third parties to collect Plaintiff's and Class Members' PII/PHI without consent.

224.    Sturdy also materially breached its contractual obligation to protect Plaintiff's and Class Members' non-public PHI/IIHI when it failed to implement adequate security measures and policies to protect the confidentiality of that information.

225.    As a result of Sturdy's failure to fulfill the data privacy protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in or reasonably expected from the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

226.    As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their PHI/IIHI, the loss of control of their PHI/IIHI, the diminution in value of their PHI/IIHI, and the loss of the benefit of the bargain they had struck with Sturdy.

227.    As a direct and proximate result of Sturdy's breach of implied contracts,

Plaintiff and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their PHI and IIHI.

228.    As a direct and proximate result of Sturdy's breach of implied contracts, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## Count V: Breach of Fiduciary Duty

229.    Sturdy breached its fiduciary duty of confidentiality by disclosing PHI and IIHI about Plaintiff and Class Members and the exact content of their communications with Sturdy.

230.    Sturdy's breach injured Plaintiff and Class Members in the following ways:

- Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

- Sturdy eroded the essential confidential nature of the provider-patient relationship;

- Sturdy took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

- Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Sturdy's duty to maintain confidentiality; and

- Sturdy's actions diminished the value of Plaintiff's and Class Members' personal information.

## Request for Relief

WHEREFORE, Plaintiff, individually and on behalf of all Class Members, requests that the Court:

- Certify the proposed Class, appoint Plaintiff as class representative and Plaintiff's counsel as class counsel;

- Permanently enjoin Sturdy from continuing the unlawful practices alleged in this Amended Complaint;

- Order Sturdy to pay both pre-judgment and post-judgment interest on any amounts awarded;

- Award actual or statutory damages pursuant to the ECPA;

- Award compensatory damages in an amount to be determined at trial;

- Declare Sturdy's business practices alleged in the Amended Complaint to be unlawful; and

- Order such other or further relief as may be appropriate.

## Demand for Jury Trial

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: March 31, 2026

Respectfully submitted,

*/s/ John Roddy*
John Roddy (BBO No. 424240)
Elizabeth Ryan (BBO No. 549632)
Bailey Glasser LLP
101 Arch Street, 8th Floor
Boston, MA 02110
(617) 439-6730 (phone)
(617) 951-3954 (fax)
jroddy@baileyglasser.com
eryan@baileyglasser.com

Lawrence J. Lederer (to seek admission *pro hac vice*)
Bart D. Cohen (to seek admission *pro hac vice*)
Bailey & Glasser LLP
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420 (phone)
(202) 463-2103 (fax)
llederer@baileyglasser.com
bcohen@baileyglasser.com

*Attorneys for Plaintiff and the Proposed Class*

CERTIFICATE OF SERVICE

I, John Roddy, hereby certify that on March 31, 2026, a true and correct unredacted version of the foregoing was emailed to counsel of record and a redacted version was filed electronically through the Court's ECF system.

/s/ John Roddy
John Roddy